Catherine M. **HOLTZ**, Plaintiff,

v.

**MARCUS THEATRES CORPORATION,**
Defendant.

No. 97–C–858.

United States District Court,
E.D. Wisconsin.

Jan. 13, 1999.

Billie Pirner, Garde, Clifford, Lyons & Garde, Washington, DC, for Plaintiff.

Barry L. Chaet, E. Vanessa Jones, Beck, Chaet, Molony & Bamberger, S.C., Milwaukee, WI, for Defendant.

## ORDER

STADTMUELLER, Chief Judge.

On August 13, 1997, Catherine M. Holtz filed a complaint against Marcus Theatres Corporation, alleging that Marcus allowed her to suffer sexual harassment and discriminated against her on the basis of sex by failing to promote her to manager in 1996, both in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000e et seq. Holtz also alleged that Marcus violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d). On September 1, 1998, Marcus moved for summary judgment on all claims, arguing that Holtz did not suffer sexual harassment and that Marcus decided not to promote her because of her lack of management experience and projection booth skills. In response, Holtz withdrew her Equal Pay Act claim but contested summary judgment regarding the other claims. The court will now consider Marcus's motion.

## I. BACKGROUND[1]

### A. Holtz's Employment History with Marcus

Catherine "Katie" Holtz is an employee of Marcus Theatres Corporation in Appleton, Wisconsin. Marcus hired Holtz on August 17, 1980 to work as a cashier at the Valley Fair Theatre in Appleton, where her supervisor was Pat Striebel. On June 1, 1984, Holtz was promoted to assistant manager/cashier at the Valley Fair.

On July 20, 1985, Striebel recommended Holtz for a People Pleaser Award, calling her "the most outstanding employee that I've ever had working for me in my almost 16 years as a manager." Striebel described her employment history and her dedication to customers. He also called her an "extremely devoted mother" and commended her for being back on the job when her daughter was only four weeks old. Striebel concluded his recommendation by saying, "If Katie didn't have her family responsibilities, I believe that she would be excellant [sic] management

material, but then again, I wouldn't like to lose her."

Striebel maintains that Holtz told him that she did not want to be considered for management because of her family responsibilities; however, Holtz disputes this, alleging that she told Striebel that she would like to manage the Valley Fair if that position ever became available. Holtz also maintains that Striebel occasionally told her that he could not wait until Holtz could take over and that she responded that she was anxious to run the place. However, Marcus points out that there is no evidence that Striebel was a decision-maker in the selection of theater managers in 1996.

Striebel recommended Holtz for another People Pleaser Award on December 29, 1985. In this recommendation, Striebel described Holtz's efforts to run the projection booth during a snowstorm, stating that she was able to thread the three projectors but that when problems occurred with a projector, Holtz called him at home and was only able to correct the problem with his instruction and trial and error methods. After her experience with the projection booth, Holtz told Striebel that she did not want to work the projection booth any longer. Striebel tried to talk her out of this decision, but she insisted. On numerous occasions after the December 1985 incident, Holtz told Striebel that she had no desire to work the projection booth.

In April 1989, Tom Ward replaced Pat Striebel as manager of the Valley Fair and also became the Appleton city manager in charge of the Valley Fair, Neenah, Viking, and Marc III theatres. Ward's main office was located at the Valley Fair. In August 1989, Ward raised Holtz's hourly wage from $4.75 to $5.00. He gave her another $.10 per hour raise in October 1989 and a further raise to $5.25 per hour in January 1990, stating, "My right arm! Would be lost without her help." Holtz received additional raises in July 1990 and November 1991, bringing her to $5.65 per hour.

### B. Holtz's Relationship with Ward

In 1990, Ward and Holtz went out for drinks approximately seven or eight times.

---

1. These facts are presented in the light most favorable to Holtz, the non-movant.

In 1991, Ward and Holtz began a voluntary and consensual sexual relationship, including Holtz's performance of oral sex on Ward about eight to ten times per year from 1991 to 1993, although the two never engaged in sexual intercourse.[2] Ward initiated the majority of their sexual contact, but Holtz initiated sexual contact on several occasions. Holtz states that she enjoyed Ward's company and the physical intimacies and emotional relationship she had with him. In 1992, Holtz became the associate manager of the Valley Fair, a position for which Ward had recommended her.

Holtz's sexual relationship with Ward ended in the spring of 1993. When Holtz was at Ward's apartment, he stated, "You wouldn't fuck me now if I asked you to," to which Holtz replied "no." Ward never asked Holtz back to his apartment after that, and their physical relationship ended. Holtz characterized this as a mutual decision to end the relationship in the discrimination complaint she filed with the ERD and EEOC: "Although our relationship did not include sexual relations we became uncomfortable with where it was headed, and attempted to return to a strictly-business relationship." Holtz did not tell anyone about the relationship until 1996, when she discussed it with her lawyer and her sister Anne.

Although the relationship was consensual and Ward never said anything implying that Holtz would be treated badly at work if she rejected his sexual advances, Holtz alleges that she submitted to Ward's advances because she believed that Ward has demonstrated a pattern of favorable treatment of female employees who accept his sexual advances and unfavorable treatment of female employees who reject his advances.[3] For example, Holtz alleges that Cheryl Perket told her that in 1989, Ward, while playing with a Nerf basketball in his office, commented to Perket, "If I make a basket it means we have sex tonight." Perket allegedly complained about this to Earl Clancy of the Corporate Office, and when Marcus management did nothing to address her complaint, Perket became frustrated with her job and eventually resigned.

Starting in August 1989, Anne Holtz Olson, Holtz's sister, worked at the Valley Fair as a cashier/vendette for approximately six to eight months. She quit because she was not happy there because Ward "wasn't a very pleasant person to work with." Anne Olson alleges that Ward "was okay" towards her when she started working for him, as she was having problems with a relationship that she was in at the time and was flirting with Ward (and kissed him at one point), but that when she resumed the other relationship, "Tom started being very mean, saying cruel things, degrading things." For example, when she made a mistake, he "would say something like well, that's a woman for you, ensuing that women aren't very smart, that he was smarter."

Holtz also alleges that in 1989 Ward dated Cheryl Knorr, a concession attendant who received preferential treatment during that time, causing Cheryl Perket, Cheryl Knorr's supervisor, to complain to management. Holtz alleges that Ward told her that the relationship ended badly with both Knorr and Ward contacting Marcus's Milwaukee office about it. Knorr quit working for Marcus not long after the relationship ended. Holtz further alleges that in 1991, Ward treated Cindy Langston badly after she rejected his advances after the Marcus Christmas Party, and her employment was terminated about two months later. Finally, Holtz alleges that after Ward began dating Maureen Morin, a concession attendant at the Marc III, Steve Olson complained that Ward increased the amount of a raise Olson had recommended for Morin and decreased the recommended raises for other employees. Olson confirmed all these allegations in his deposition.[4]

**2.** Their sexual contact never occurred at work, although Holtz once performed oral sex on Ward at his hotel room during a Corporate Management meeting in Milwaukee in 1992.

**3.** Holtz also alleges that she submitted to Ward's advances for a second reason: "Because I was married at this time I also feared that if I rejected Mr. Ward's requests for sex he would expose our relationship to my husband." The court must assume that this reason does not apply to Ward and Holtz's first sexual encounter.

**4.** Marcus argues that this evidence about Ward's experiences with other female employees would be inadmissible as hearsay and thus may not be considered in deciding its summary judgment

Holtz alleges that after her sexual relationship with Ward ended, Ward's treatment and evaluations of Holtz became consistently more negative. In October 1995, Holtz complained to Don Perkins, Marcus's Vice President of Operations and Ward's supervisor, because Ward wanted her to make up some of the time she took off to attend her father's funeral. Perkins decided that Holtz did not have to make up the time. In February 1996, Holtz called Amy Wangerin, Marcus's human resources manager, because Ward had questioned Holtz about breaking his office chair. Marcus responds that Holtz has not shown Ward's actions to be unrelated to her work or different from his interactions with other employees. Marcus also notes that Holtz's own behavior in the workplace has included sexually oriented joke telling, joking about breath mints and oral sex, and talking about sex and sexual situations to anyone who would listen.

### C. 1996 Manager Decisions

In early 1996, Ward told Holtz, Jeff Theimer, and Steve Olson what his recommendations were going to be for job placements after the Hollywood Theatre, which was under construction in Appleton at the time, opened. At that time, Olson was theatre manager of the Marc III, a position he had held since 1990, and Theimer was the manager of the Neenah Budget Theater, a position he had held since 1993. Ward recommended Olson as theatre manager for the Valley Fair, Jeff Theimer for theatre manager of the Marc III, and Holtz for manager of the Neenah. Holtz did not pay "a whole lot of attention" to Ward's recommendations and did not express any interest in the position at the time.

In or about March 1996, it was announced that Olson would be theatre manager of the Valley Fair. Ward had recommended Olson for this position, but he does not know if that was the deciding factor, only that he and Perkins "both agreed that that's where he should go." [5]

On March 20, 1996, Holtz faxed a letter to Perkins expressing her interest in managing the Marc III. Ward told her that regardless of her letter, Marcus does what their city managers recommend. Perkins then met with Holtz on or about April 4, 1996. At this meeting, Holtz told Perkins about Ward's behavior and management style and how Ward did not work as much as Marcus management thought he did. Holtz also asked how Marcus could "just give the Valley to Steve [Olson] without even talking to me first because I had been with the company longer and I was just as qualified." Perkins responded that Olson had more seniority in management (although Holtz had more years of overall experience with Marcus than Olson).

When Holtz challenged this assertion by citing other instances in which the person with the most management seniority had not been promoted, Perkins told her that she did not have the requisite booth experience to be a manager. Perkins said that to manage the Marc, and particularly the Neenah, booth experience was necessary because of old equipment. Therefore, Perkins said that Jeff Theimer, who had the necessary booth experience, would probably stay in charge of the Neenah and the Marc.[6]

On April 18, 1996, Perkins and Wangerin met with Holtz and told her that Olson would be made the manager of the Valley and

---

motion. *See Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 570 n. 4 (7th Cir.1989). However, although the court cannot make a definitive ruling on this issue at this time, the court believes that Holtz would submit this evidence not for the truth of the matter asserted but only to show her state of mind upon entering the sexual relationship with Ward. In any event, it is Marcus's burden as the movant to convince the court to reject this evidence, and this Marcus has not done. Therefore, the court will consider this evidence for the time being.

5. Holtz alleges that city managers under Perkins have the authority to promote an employee from

associate manager to theater manager subject to Perkins's approval, citing pages 11 and 12 of Perkins's deposition. *See Plaintiff's Response to Defendant's Proposed Findings of Fact at ¶ 56.* However, those pages contain no information regarding how theater managers are selected, so the court will reject this proposed finding of fact.

6. Marcus management had also discussed with Holtz the possibility of her managing the Funset Boulevard entertainment center, but Holtz was not interested.

would remain as manager of the Marc, that Theimer would remain as the manager of the Neenah and would become associate manager at the Hollywood, and that Holtz would remain as associate manager at the Valley Fair. At this meeting, it was also discussed that Holtz needed booth training before she would be qualified to run her own theatre and that the door was open for Holtz to manage the Marc III in the future once she had more booth training. Holtz's need for booth training has been listed as a weakness or developmental need in all her performance appraisals since 1992.

Marcus employees learn to operate the booth and to use projection equipment through hands-on, on-the-job training rather than through formal training. Most employees learn how to operate projection booth equipment when they are ushers, and learning these skills is not part of the job duties or job description for cashiers or vendors. Generally, Marcus hires men to be ushers and women to be cashiers and vendors. Steve Olson, one of the individuals promoted ahead of Holtz, knows of female employees who were taught projection skills, but not as part of their cashier responsibilities.

As of March 1996, all ushers at theaters under Ward's management were male, while all cashiers and vendors at theaters under Ward's management were female. Olson does not recall any female ushers ever working at theaters under Ward's management. Holtz was present on two occasions when a female employee asked Ward to become an usher, and he denied these requests without explanation. In a conversation after work between 1991 and 1993, Holtz alleges that Ward told her that people expect to see girls selling tickets, girls selling popcorn, and boys tearing the tickets. As of 1996, all theater managers under Ward's direct supervision as Appleton city manager were males.

The parties dispute whether Holtz ever asked for more booth training. Holtz alleges that she asked about formal booth training at her 1994 performance review meeting but that she was never provided with formal booth training. She also alleges that Don Perkins and Tom Ward told her that Olson would train her, but that this never occurred. She also alleges that she asked Olson about booth training, but that "he said it was not a priority of his at this time," although Holtz agreed with him. Olson alleges that Holtz never came to him and asked him to teach her how to make up and tear down, the one booth skill she was lacking. Viewing the facts in the light most favorable to Holtz, the court must assume for the purposes of Marcus's motion for summary judgment that Holtz repeatedly asked for booth training but was never provided with it.

### D. Marcus's Policies

Marcus has a sexual harassment policy, an open door policy, and a Careline. The sexual harassment policy has been posted at Valley Fair Theatre since at least 1995. Holtz alleges that an issue of fact exists as to whether these polices are implemented in any meaningful way, at least with regard to Ward. Although the Careline is purported to be confidential, complaints made to the Careline relating to personnel under Don Perkins are referred to him. Perkins passes these complaints on to the supervisor of the employee who complained, even if the complaint was made about the supervisor. When asked at his deposition why the Careline assures confidentiality, Perkins responded that this was "a very good question." Olson confirmed that in his experience, employees' use of the Careline has been neither confidential nor successful.

Holtz alleges that these policies are even less useful with regard to Ward because Perkins has worked with Ward for about twenty years and considers Ward to be a "very close friend." Olson testified at his deposition that when he expressed a minor concern about Ward to Perkins, Perkins responded defensively, praised Ward's friendship with him, and talked about how "Tom would do anything for me, and talked about how great a guy Tom was." Olson concluded that Ward "really had it in well with the corporate office" and that "it's either work for Tom or work for a different company." As a result, Olson refrained from raising further complaints to management about Ward. Furthermore, when Perkins received a complaint about Ward from a customer who called him "the rudest, most inconsiderate person I ever dealt with," Perkins "didn't do anything"

about the complaint because he didn't want to upset Ward and wanted Ward to be "upbeat" about his work.

In the April 4, 1996 meeting that Holtz had with Perkins, Holtz complained to Perkins about Ward's behavior at work and his conduct towards his employees. That evening Perkins had dinner with Ward. The next day, Holtz learned that Perkins had told Ward what she said about him. Holtz called the Careline and complained about Perkins passing on these complaints. Perkins then told Holtz he was hurt and felt like she had hit him below the belt by calling the Careline. Five days after Perkins told Ward about Holtz's comments, Ward disciplined Holtz in a memo for the first time.

Marcus's corporate manual has an anti-fraternization policy which states as follows: "Serious social relationships between a supervisor and subordinate, while not expressly prohibited, are strongly discouraged as having a high possibility of undesirable later ramifications for both the individuals involved and the company." However, Perkins believes that Marcus cannot control personal relationships between supervisors and subordinates outside of the workplace and has "never once ever told them they can't do it."

### E. Holtz's Lawsuit

In July 1996, Marcus received correspondence from Holtz's attorney which raised allegations of sexual harassment against Tom Ward for the first time. Holtz filed her discrimination complaint with the Equal Rights Division (ERD) of the Wisconsin Department of Workforce Development and the Equal Employment Opportunity Commission (EEOC) on August 15, 1996. Prior to a hearing on the merits before an ERD Administrative Law Judge, Holtz withdrew her complaint and obtained a Notice of Right to Sue letter from the EEOC on May 20, 1997.

On August 13, 1997, Holtz filed a complaint against Marcus in this court, alleging that Marcus allowed her to suffer sexual harassment and discriminated against her on the basis of sex by failing to promote her to manager in 1996 (Holtz also alleged a violation of the Equal Pay Act but has withdrawn that claim). Marcus now moves for summary judgment on both claims, arguing that (1) Holtz cannot show that she was victimized by an actionable hostile environment or that a tangible employment action resulted from alleged sexual harassment by Ward; and (2) Holtz cannot establish a prima facie case of sex discrimination, and Marcus has presented legitimate, non-discriminatory reasons for its employment decisions that Holtz cannot prove are pretextual.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Only "genuine" issues of "material" fact will defeat an otherwise proper motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over such material fact is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law by informing the court of the portions of the record or affidavits that demonstrate an absence of a triable issue. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may meet its burden by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue of material fact is resolved against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. Sexual Harassment Claim

Although the United States Supreme Court has stated that the categories of "quid pro quo" and "hostile work environment" are of "limited utility," the Court essentially held that this was so only regarding the standard of liability to be imposed on the employer. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, ——, 118 · S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998). With regard to the initial inquiry into whether a plaintiff can prove actionable discrimination, however, the terms remain useful: "To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII." *Id.* at 2265. Therefore, the court will consider whether Holtz can prove sexual harassment either under the "hostile work environment" structure or under the "quid pro quo" structure.

### 1. Hostile Work Environment

■ "[S]exual harassment so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment' violates Title VII." *Faragher v. City of Boca Raton,* 524 U.S. 775, ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). To establish the existence of a hostile work environment, a plaintiff must prove that she was a member of a protected group, that she was subject to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, that the harassment was based on sex, that the harassment unreasonably interfered with the plaintiff's work performance, and that the employer has respondeat superior liability. *See Swanson v. Elmhurst Chrysler Plymouth, Inc.,* 882 F.2d 1235, 1238 (7th Cir.1989).

■ "[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." 524 U.S. at ——, 118 S.Ct. at 2283 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A court must determine "whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" 524 U.S. at ——, 118 S.Ct. at 2283 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). These standards "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" 524 U.S. at —— – ——, 118 S.Ct. at 2283–84 (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)).

For example, in *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333 (7th Cir. 1993), the Seventh Circuit found no actionable hostile work environment when a supervisor asked plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her in a bar. *Id.* at 337. In *Saxton v. American Telephone and Telegraph Co.,* 10 F.3d 526 (7th Cir.1993), the Seventh Circuit found no actionable hostile work environment when a supervisor placed his hand on plaintiff's leg above the knee several times, rubbed his hand along her upper thigh once, pulled her into a doorway and kissed her for two to three seconds, and later lurched at her as if to grab her. *Id.* at 528. In *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 (7th Cir.1986), the Seventh Circuit found no actionable hostile work environment when the plaintiff was subjected to propositions, lewd comments, and a slap on the buttocks. *Id.* at 211–12.

In this case, the totality of Ward's conduct that Holtz alleges constitutes a hostile work environment consists of his criticisms of Holtz and other female employees:

Mr. Ward regularly made demeaning and disparaging comments about females, and was especially unpleasant to women. Mr. Ward yelled at Ms. Holtz, and repeatedly snapped at her and other female employ-

ees, and regularly provoked them to tears. After awhile, it appeared to one witness who testified that Mr. Ward wanted this result. Ms. Holtz witnessed several occasions where Mr. Ward made errors in counting, but persisted in blaming female employees for the errors, making them count over and over. On several occasions after October, 1995, he called Ms. Holtz at home and chewed her out, accusing her of doing things to his office that she had not done. Female employees who were the target of Mr. Ward's temper regularly complained to Ms. Holtz about him. Disputes between Ms. Holtz and Mr. Ward often arose when she would try to defend the other female employees to him.

Plaintiff's Opposition to Motion for Summary Judgment at 28–29 (citations omitted).

■ Ward never made any sexual comments or did anything of a sexual nature to Holtz in the workplace. The one comment he made at work that was of a sexual nature, the Nerf-basketball comment made to Cheryl Perket, was, at best, "second-hand harassment" whose impact "is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (7th Cir.1997). Although "[t]he predicate acts which support a hostile-environment sexual-harassment claim need not be explicitly sexual in nature," *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir.1993), the acts still must be sufficiently " 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.' " *Faragher*, 524 U.S. at ——, 118 S.Ct. at 2283 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399). In *Kopp*, the supervisor's conduct towards women, although not explicitly sexual, was much more severe than Ward's: he grabbed the plaintiff by her lapels and bra straps and yelled at her; he shocked a female employee with defibrillator paddles and threatened to do the same to another because they did not move out of the way quickly enough; he threw a patient chart within inches of a female employee's face; he told a female therapist to "get her

'tits' out of the way";  and he called another female employee "fat bitch" or "fat lady." *See* 13 F.3d at 267–68.

■ In contrast, Ward's actions in the workplace, even if directed at men more than at women, a point which the parties dispute, fall far short of being sufficiently "severe or pervasive" to create a hostile work environment or to unreasonably interfere with Holtz's work performance. Merely yelling at female employees and calling them names does not rise to the level of an actionable hostile work environment. *See Reyes v. McDonald Pontiac GMC Truck, Inc.*, 997 F.Supp. 614, 617 (D.N.J.1998). Therefore, the court holds that Holtz has not sufficiently established the existence of an actionable hostile work environment to survive summary judgment on this point.

### 2. Quid Pro Quo

■ Quid pro quo sexual harassment occurs when submission to sexual demands is made a condition of tangible employment benefits. *See Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456 (7th Cir.1990). A "tangible employment action constitutes a significant change in employment status, such as ... failing to promote." *Burlington Indus.*, 524 U.S. at ——, 118 S.Ct. at 2268. To establish a prima facie case of quid pro quo sexual harassment, a plaintiff must prove that: (1) she is a member of a protected group; (2) unwelcome sexual advances were made; (3) the harassment was sexually motivated; (4) plaintiff's reaction to the advances negatively affected a tangible aspect of her employment; and (5) respondeat superior has been established. *See Drago v. Aetna Plywood, Inc.*, 968 F.Supp. 1251, 1254 (N.D.Ill.1997).

■ Holtz alleges that she was denied the promotion to manager because she refused to continue her sexual relationship with Ward. Marcus argues that this claim must fail because, inter alia, Holtz cannot show a causal link between the end of her sexual relationship with Ward in 1993 and the manager decisions in 1996 because too much time elapsed and too many events intervened.[7]

7. Marcus also argues that this claim must fail because Ward did not make the decision not to promote Holtz. *See Burlington Indus.*, 118 S.Ct. at 2269. However, there appears to be a factual

dispute regarding how much input Ward actually had in this decision, which was ultimately made by Perkins at least partially on the basis of

The court agrees with Marcus. A three-year lapse between the end of her consensual sexual relationship with Ward in 1993 and Marcus's decision regarding the hiring of managers in 1996 stretches the causal chain beyond the point of breaking. *See Sweeney v. West,* 149 F.3d 550, 557 (7th Cir.1998) (holding that gap of three years between protected expression and adverse employment action defeated claim of causal connection); *see also Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1039 (7th Cir.1998) (holding that a gap of less than a year "is insufficient to establish the causation prong of a prima facie case"); *see also Potenec v. Morgan Guar. Trust Co.,* No. 83 Civ. 4764–CSH, 1985 WL 2049, at *3 (S.D.N.Y. July 24, 1985) (holding that long lapse of time "between plaintiff's employment termination and the purported sexual advances raises serious questions about a causal nexus," defeating quid pro quo claim); *Schuster v. New York State Unified Court Sys.,* 92 CIV. 8931(TPG), 1995 WL 230420 (S.D.N.Y. Apr. 18, 1995) (same).

Holtz claims that the 1996 denial of promotions was causally linked with the termination of her sexual relationship with Ward in 1993 because she suffered "an extended period of hostile treatment from him, culminating in his denial of a promotion to her." Plaintiff's Opposition at 3. Although in certain cases plaintiffs can establish a causal link by showing a "pattern of criticism and animosity," *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1014 (7th Cir.1997), Holtz has failed to demonstrate such a pattern in this case. Not only do the isolated, non-sexual criticisms of her by Ward between 1993 and 1996 fail to establish the existence of an actionable hostile work environment, as held above, but they do not establish a "pattern"

of hostile treatment sufficient to link the 1993 termination of Holtz's sexual relationship with Ward with the 1996 denial of promotions. Because Holtz has not established a prima facie quid pro quo case regarding the element of causation, this claim must fail.[8]

Moreover, Holtz probably could not maintain a quid pro quo claim even if she could prove a causal link, because "when an employer penalizes an employee after the termination of a consensual relationship, a presumption arises that the employer acted not on the basis of gender, but on the basis of the failed interpersonal relationship—a presumption rebuttable only if the employee can demonstrate that the employer demanded further sexual relationships before taking the action he did." *Keppler v. Hinsdale Township High Sch. Dist. 86,* 715 F.Supp. 862, 869 (N.D.Ill.1989) (citing *Huebschen v. Dep't of Health and Soc. Servs.,* 716 F.2d 1167 (7th Cir.1983)). In this case, Ward never demanded further sexual favors from Holtz after their sexual relationship ended, "[n]or did he even hint that by refusing to continue their sexual relationship she was jeopardizing her job." 715 F.Supp. at 869.

The cases cited by Holtz involving the termination of a consensual sexual relationship are distinguishable on this point. For example, in *Walker v. MacFrugals Bargains, Closeouts, Inc.,* No. Civ. A. 93–4135, 1994 WL 693387 (E.D.La. Dec.9, 1994), the supervisor made numerous unsolicited attempts to resume a sexual relationship with the plaintiff, including telling her that he would make her life at work "more difficult" if she did not capitulate to his demands. *Id.* at *4. There is no indication that Ward ever attempted to resume a sexual relationship with Holtz after its termination. Thus, the court must grant

---

Ward's recommendations. *See Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990). Therefore, the court will not grant Marcus summary judgment on this basis.

8. Marcus also moved for summary judgment on Holtz's "retaliation" claim, which does not appear to be a traditional retaliation claim (involving an adverse employment action in retaliation for protected activity) but is instead essentially a quid pro quo claim, because it is characterized as "retaliation for refusing to submit to the sexual advances of a supervisor." Defendant's Brief

in Support of Its Motion for Summary Judgment at 1. To the extent Holtz alleged such a retaliation claim, Marcus is granted summary judgment on it for the same reason Marcus must be granted summary judgment on Holtz's quid pro quo claim, that is, lack of causation. To the extent Holtz alleges a traditional retaliation claim based on her discrimination complaint, Marcus must be granted summary judgment on this claim as well, because the adverse employment action, Marcus's failure to promote her, occurred before Holtz filed her discrimination complaint.

Marcus summary judgment on Holtz's sexual harassment claim.[9]

## B. Sex Discrimination Claim

■ Holtz also alleges that Marcus failed to promote her because of discrimination on the basis of sex. To establish a prima facie case of failure to promote, Holtz has the burden of showing that (1) she applied for a promotion; (2) she was entitled to the promotion; and (3) the individuals promoted had the same or lesser qualifications. *See Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. Dec. 28, 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Marcus asserts that Holtz was not entitled to be promoted to manager at the Valley Fair Theatre because Olson had more management experience than she did and that she was not entitled to be promoted to manager at the Marc III because of her lack of booth skills. *See* Defendant's Proposed Findings of Fact at ¶ 54. Holtz responds that she has all the necessary booth skills except for setting up and tearing down the film, although she can verify that it has occurred, which she contends is all that is required of managers. *See* Plaintiff's Ex. 14. Holtz also contends that because of Ward's and Marcus's discriminatory practices, female Marcus employees cannot acquire the necessary booth skills.

Holtz does not dispute that Olson has more years of management experience than she does and that he already had been a manager for several years when he was chosen to manage the Valley Fair. Her only response to this is that she had more years of overall experience than Olson. However, the court cannot second-guess Marcus's decision that the amount of management experience is more important than the amount of overall experience in selecting managers, because the court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986). Because Holtz has not proven that she was entitled to a promotion nor that Olson was equally or less qualified, it would appear that the court must grant Marcus summary judgment regarding Holtz's claim of failure to promote her to manager of the Valley Fair. *See Bragg*, at 376.

■ Regarding the choices for manager of the Marc III, the court is confused by Marcus's assertion that Holtz was not entitled to be promoted to manager at the Marc III because of her lack of booth skills. It appears to the court that there is a much more fundamental problem with Holtz's claim, which is that Olson remained as manager of the Marc III from 1990 until its recent closure.[10] If Olson was more qualified than Holtz for the Valley Fair position because of his superior management experience, then it would seem that he was also more qualified to manage the Marc III for the same reason. This is especially true considering that he had been manager of the Marc III since 1990. Therefore, it would appear that the court must grant summary judgment for Marcus on Holtz's failure to promote claim. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir.1995) (holding that court must grant summary judgment for defendant if there is at least one legitimate nondiscriminatory reason for employment decision).

However, the court cannot wholly ignore the parties' dispute regarding Holtz's lack of booth skills, especially because it is Marcus's official proffered reason for not promoting Holtz to manager of the Marc III. *See* Defendant's Proposed Findings of Fact at ¶ 54. The court also must deal with this issue because Holtz asserts that it forms the basis of a separate claim of disparate-impact dis-

---

9. Marcus also argues that Holtz's sexual harassment claim must be dismissed because she complains of events that fall outside the statute of limitations, which would be 300 days prior to the filing of her ERD complaint on or about August 16, 1996 (approximately October 22, 1995). Because the court will dismiss Holtz's sexual harassment claim on other grounds, the court need not consider this issue.

10. Olson did not manage the Marc III full-time but only spent about eight hours per week there before it closed. Alice Jandourek served as "house manager" when Olson was absent; however, she was actually only an "assistant manager" who received an hourly wage, not a salaried "manager" who receives bonuses and benefits. *See* Perkins Dep. at 100. Therefore, Olson, not Jandourek, was the manager of the Marc III.

crimination that has not been the subject of a summary judgment motion by Marcus. *See* Plaintiff's Opposition to Motion for Summary Judgment at 18 n. 4.

Even if the court treated Holtz's lack of booth skills as Marcus's sole reason for not promoting Holtz to manager of the Marc III, it would appear that Marcus would still be entitled to summary judgment on Holtz's failure to promote claim. It cannot be disputed that at the time the manager decisions were made, Holtz did not have the requisite booth skills to qualify her to be a manager. Holtz's assertion that this was a minor problem that could be corrected with a few hours of training or that her inability to set up and tear down film was not an important part of the manager job is irrelevant, because, again, the court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Id.* Whether the ability to set up and tear down film is made a requirement to become a manager is not a question for this court but is solely for Marcus to decide, and it is undisputed that Holtz did not have this skill. Holtz has not proven that she was entitled to a promotion, nor that those promoted were equally or less qualified. *See Bragg,* at 376. Thus, it would appear that Holtz has not presented a prima facie case of failure to promote, and that even if she had, she cannot show that Marcus's proffered legitimate nondiscriminatory reason is pretextual.

However, in certain situations, a plaintiff can still establish a prima facie case and show that a proffered legitimate nondiscriminatory reason is pretextual by showing that those promoted received "preferential training." *See Hughes v. Derwinski,* 967 F.2d 1168, 1174 (7th Cir.1992). In *Hughes,* the woman promoted received preferential training in being allowed to stay as "Acting Assistant Chief" for eight months without rotation, which defendant's personnel officer testified was "unusual and constitutes preferential treatment." *Id.* Similarly, in *Edwards v. Hodel,* 738 F.Supp. 426 (D.Colo.1990), *aff'd as modified, Edwards v. Lujan,* 40 F.3d 1152 (10th Cir.1994), only non-blacks were given the extra training provided by temporary assignments to other positions, which "elimi-

nat[ed] any chance of advancement by Blacks." *Id.* at 428. In *Wilmore v. City of Wilmington,* 699 F.2d 667 (3d Cir.1983), "the exclusion of minority firefighters from 'administrative jobs' because of their race with its consequent detrimental effect on their promotional test scores" was held to be "the kind of 'artificial, arbitrary and unnecessary' barrier[ ] to professional development the [Supreme] Court found in [*Connecticut v.*] *Teal* [457 U.S. 440, 102 S.Ct. 2525, 2533, 73 L.Ed.2d 130 (1982) ] to be prohibited by Title VII." 699 F.2d at 672 (internal quotations omitted).

Holtz presents a wealth of evidence showing preferential treatment of males regarding booth skills training, for example, Ward's refusal to let female employees under his supervision be ushers and his statement that people expect to see girls selling tickets, girls selling popcorn, and boys tearing the tickets. As noted above, most employees learn how to operate projection booth equipment when they are ushers, and learning these skills is not part of the job duties or job description for cashiers or vendettes.[11] Also, there is a factual dispute regarding whether Holtz asked for booth skills training. Viewing the facts in the light most favorable to Holtz, the court must assume that Holtz repeatedly asked for booth skills training but was not provided with it. Further evidence of pretext is Plaintiff's Exhibit 15, Ward's handwritten list of Valley Value Cinema and Marc III employees in which the employees are categorized only by "sex" and "position," with 23 females listed as cashiers or vendettes and 11 males listed as ushers. The court also notes that there apparently has never been a female usher under Ward's supervision as manager nor a female manager under Ward's supervision as city manager.

As in *Hughes, Edwards,* and *Wilmore,* it appears that only those outside the protected group were allowed to participate in the training necessary for advancement (at least regarding employees under Ward's supervision). Therefore, the court holds that Holtz has presented enough evidence of preferential training to withstand Marcus's summary

---

11. A jury may find further evidence of pretext in the fact that female employees in the position of

"vendor" are commonly referred to as "vendettes" by Marcus personnel.

judgment motion on Holtz's failure to promote claim. This holding applies to the manager decisions regarding the Valley Fair as well as the Marc III, because a jury may find that Olson received both positions through management experience that was gained because of training not available to Holtz. The court also holds open the possibility that Holtz has a viable disparate-impact claim regarding booth-skills training, but because the parties did not brief this issue, the court will not address it. Therefore, the court will deny Marcus's motion for summary judgment on Holtz's failure to promote sex discrimination claim.

### III. CONCLUSION

For the reasons stated above, the court will deny in part and grant in part Marcus's motion for summary judgment. The court will grant the motion regarding Holtz's quid pro quo and hostile work environment sexual harassment claims, but will deny the motion regarding Holtz's failure to promote sex discrimination claim.

Accordingly,

**IT IS ORDERED** that defendant's motion for summary judgment be and the same is hereby **GRANTED** in part and **DENIED** in part.