Amanda J. WEST, Plaintiff,

v.

MCI WORLDCOM, INC., et al. Defendants.

No. CIV.A. 01–1256–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 5, 2002.

Victor Michael Glasberg, Alexandria, VA, Elizabeth A. Lalik, Pillsbury Winthrop, McLean, VA, for Plaintiff.

David Ray Shopfner, Washington, DC, Edward Reynolds Wilson, Kalijarvi, Chuzi & Newman, Washington, DC, for Defendants.

## MEMORANDUM OPINION

LEE, District Judge.

THIS MATTER is before the Court on Defendants MCI Worldcom, Inc., ("MCI"), Maxim Group, Inc. ("Maxim"), and William Quale ("Quale"), collectively referred to as "Defendants," motions for summary judgment on Plaintiff Amanda J. West's ("West") claims of quid pro quo sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and tortious interference with her at-will contractual relationships with MCI and Maxim. West was hired by Maxim to work as a temporary contractor on a project for Maxim's client, MCI. While working at MCI, West began a consensual romantic relationship with Quale that she later ended. West's Title VII claim arises out of MCI's decision to remove West from the project, which West contends stemmed from her rebukes of Quale's unwanted sexual advances after termination of their consensual relationship.

The Defendants raise several issues before the Court seeking to dismiss West's claim, but the Court finds that two questions presented are dispositive. The first

is whether West meets her threshold burden of demonstrating that she qualifies as an employee of MCI under Title VII for purposes of invoking jurisdiction against that defendant. The second issue is whether there exists a genuine issue of material fact regarding whether Quale made any unwanted sexual advances toward West and whether Quale's actions to remove West from the project were "because of sex."

On April 19, 2001, this Court granted Defendants' summary judgment motions in a preliminary order. The April 19th Order indicated that the Court would later release a substantive memorandum order explaining the merits of the decision and that the period for appeal was tolled until release of the subsequent memorandum order. For the reasons discussed below, the Court GRANTS MCI's motion for summary judgment because West has failed to show that she was an employee of MCI for purposes of Title VII jurisdiction. MCI's lack of direct supervisory control over West's services, the unambiguous intent of the parties manifested in various contractual documents that West was an independent contractor, and the fact that Maxim, not MCI, undertook the relevant tax withholding obligations, provided West benefits, and paid her salary, all indicate that West was an independent contractor and not an employee of MCI.

Turning to the merits of West's sexual harassment claim, the Court GRANTS Maxim and Quale's motions for summary judgment against West as well. The Court holds that West's Title VII claim cannot withstand summary judgment because she fails to raise a genuine issue of fact demonstrating that Quale made any unwanted sexual advances after termination of their consensual relationship. West therefore cannot demonstrate that Quale's actions to have her removed from

the MCI project were motivated by West's gender, rather than by personal animosity over their failed relationship. Because West's Title VII claim does not withstand summary judgment, West cannot establish a prima facie claim of tortious interference against Quale and therefore summary judgment on this count is warranted as well.

## I. BACKGROUND

### A. The Terms and Conditions of West's Employment.

In the fall of 1998, Plaintiff Amanda J. West ("West") interviewed with Defendant Maxim Group, Inc. ("Maxim") for a position as a Systems Developer. Maxim is a temporary staffing company that employs individuals with technical capabilities on a temporary basis and assigns them to work on various projects for Maxim's clients. One of Maxim's clients is Defendant MCI Worldcom, Inc. ("MCI"), a global telecommunications company. Maxim and MCI entered into a Primary Master Vendor Agreement ("Master Agreement") on April 1, 1997, that governed the independent contractors assigned by Maxim to work on MCI projects. (MCI App. Ex. 10.) The Master Agreement states that Maxim, as the contractor, is responsible for providing all employee-related benefits and meeting all federal and state tax withholding obligations. (Master Agreement ¶ 5.1.C.)

Maxim interviewed West as a Systems Developer for the purpose of working on MCI's SCA Gateway Project. The Gateway Project was a web-based project designed to consolidate records from MCI's various billing systems into a format that would be usable by all of MCI's billing centers across the country. West had a second interview with John Discount, an MCI employee who recommended her to Stephan Jernigan, another MCI employee and Program Manager of the SCA Gate-

way Project. (Discount Dep. at 43–47.) Jernigan approved West's hiring. (*Id.*)

After receiving approval from Jernigan, Maxim began West's employment on the SCA Gateway Project on November 11, 1998, at the MCI facility in Arlington, Virginia. The Staff Consultant Employment Agreement ("Consultant Agreement") controlled the terms and conditions of West's employment. (MCI App. Ex. 8.) The Consultant Agreement states that West is a Maxim employee.

> You [West] recognize and agree that you are an employee of Maxim and not an employee of the client [MCI] and you will look solely to Maxim for all employee benefits in connection with your employment under this agreement.

(Consultant Agreement ¶ 11.) West's compensation package from Maxim included an annual base salary of $62,000, health and dental benefits, vacation and 401(k) plan eligibility. Pursuant to the Master Agreement, Maxim provided employee benefits to West and assumed responsibility for the relevant tax withholding obligations. (Master Agreement ¶ 5.1.C; Consultant Agreement at ¶¶ 4–5.)

Both MCI employees and employees from various temporary staffing firms such as Maxim worked on the SCA Gateway Project. Ms. Mastanch Zavar, an MCI employee, served as the Director of the Project. Jernigan and Scott Mitchell reported to Zavar, acting as Program Managers for their team leads and respective staffs. Discount served as the team lead for the batch development team and Defendant William Quale, an employee of another temporary staffing company named COMSYS/Metamor, served as team lead for the online development team. Both Discount and Quale reported to Jernigan. West initially worked on Discount's team, but was later transferred to Quale's team in December 1998. Jernigan had ultimate authority over West's employment on the SCA Gateway Project, but ordinarily did not supervise West's day-to-day activities.

West's responsibilities on the Project included computer programming and system development services. West specialized in mainframe computer programming and the Common Business Oriented Language ("COBOL"). (West Dep. at 137–139.) Discount and Quale delegated work and assignments to West. Discount, however, did not provide West with any directions as to how West should complete the tasks assigned to her concerning her COBOL related work. (West Dep. at 164–65.) Similarly, Quale did not directly supervise West's work because he did not have mainframe-COBOL expertise. West testified that she largely relied on her own expertise to independently perform and complete her assignments from Quale. (West Dep. at 170–71.) West did not receive an informal or formal evaluation of her performance from Discount or Quale, nor any counseling, coaching or training. (West Dep. at 151–52; Jernigan Dep. at 88). MCI required the Maxim independent contractors such as West to work on the SCA Gateway Project during certain core hours. (Cortezi Dep. at 35.) West was required to have her leave approved by MCI. (*Id.* at 36–37.)

In May 1999, West renegotiated her contract with Maxim. In doing so, West agreed to relinquish certain fringe benefits, including health and dental insurance and "bench time," periods following removal from a project, in exchange for an increase in gross pay. Under her second employment contract, entered into May 6, 1999, Maxim increased West's annual salary to $ 83,200. (MCI's App. Ex. 9 Employment Agreement ¶ 3.) MCI did not participate in West's contract negotiations with Maxim in any manner. (Cortezi Dep. at 23–28, 123–24; Jernigan Dep. at 48–58,

245–46.) The second contract bears the same "acknowledgment of employee relationship" provision as the initial contract stating that West is an employee of Maxim and not MCI. (Employment Agreement ¶ 10.) Notably, West failed to pursue discussions with Jernigan to become an employee with MCI. (West Dep. at 180–81.)

## B. West's Relationship with William Quale.

In the meantime, West and Quale began a consensual sexual relationship in January 1999 that lasted until early July 1999. (West Dep. at 487, 552–53.) West concedes that at no time did Quale make any sexual demands of her. (West Dep. at 496–97.) West describes their relationship as cyclical in nature. (West at Dep. at 521–22.) The pair would frequently quarrel, followed by West breaking off the relationship for a period until the parties reconciled. In her declaration, West states that during the breakup periods, Quale would enter West's office and approach her intimately by resting his hand on her shoulder or leg while talking to her. (West Decl. ¶ 6.) West would eventually reestablish the relationship by calling Quale a couple weeks after the breakup. (West Dep. at 528–29.) Prior to being removed from the MCI project on September 1, 1999, West did not inform anyone in MCI management or at Maxim, of her relationship with Quale. (West Dep. at 178–189.)

Over a Fourth of July 1999 weekend trip in Florida, the pair had another falling out and West conveyed to Quale that she was ending their personal relationship for good. (West Dep. at 552–553.) Upon return to work, West indicates that Quale behaved normally with West. (West Dep. at 556–57.) West states in her declaration that Quale continued his "normal pattern" of restarting their relationship by entering her office, intimately touching her, and acting in a flirtatious and inappropriate manner. (West Decl. ¶ 7.) However, in her deposition testimony, she states that Quale intimately touched her in her office only during the period preceding the July 4th Breakup. (West Dep. at 520.) Further, at her deposition, West testified that Quale did not say or do anything inappropriate on his visits to her office after the July 4th Breakup. (West Dep. at 557.) Quale also made three to four phone calls to West's home during July and August. (West Dep. at 578–79; Pittman Dep. at 56–57). Quale did not speak to West on any of these occasions because she had asked her roommate, Carl Pittman, to screen her calls and take messages. Quale left brief messages with Pittman asking that West call him. (Pittman Dep. at 110.) West did not return the calls.

Quale's behavior toward West at work began to sour sometime in July. (West Dep. at 558.) She states that Quale started to "snip and yell" derogatory comments about West across the office. (West Dep. at 558–59.) West's co-worker Sarat Chandran observed Quale using "strong tones" with West on at least one occasion. (Chandran Dep. at 118–121.) Chandran did not observe Quale using "strong tones" with other employees. (*Id.*) Chandran recalled another incident where Quale removed his headphones in an "aggressive" manner after becoming upset with West. (*Id.* at 204–208.)

West began to date John Dalstrom, another co-worker, in early August 1999. (West Dep. at 193, 573.) Quale was aware of the new relationship. (Quale Dep. at 225–26.) During August, West avoided contact with Quale at work. (West Dep. at 430–31.) The two stopped speaking altogether and West eventually enlisted Chandran to serve as a go-between between West and Quale. (Chandran Dep. at 117.)

West states that Quale reduced the number of assignments he gave to her in August. (West Dep. at 218.)

## C. West's Removal from the SCA Gateway Project.

Over the course of West's employment, Jernigan testified at his deposition that he developed a negative impression of West's work. (Jernigan Dep. at 146–47.) This was initially based on Jernigan's belief that West demonstrated a lack of initiative from the beginning of her work on the SCA Gateway Project. (*Id.* at 134.) Specifically, Jernigan based this impression on West's performance involving two projects Jernigan directly assigned to West. In the first instance, Jernigan had assigned a project to West on a Monday and checked in with her a week later. When Jernigan asked West about her status, she responded that she had finished the project the previous Tuesday. (Jernigan Dep. at 135–36.) Jernigan concluded that West "would do exactly what you gave her and nothing more." (*Id.*) In addition, Jernigan assigned West a project to build a web page in the summer of 1999. Jernigan assigned an identical project to Chandran who completed the assignment in early August. (*Id.* at 96.) West never indicated to Jernigan whether she had completed the project. (*Id.* at 99–100.)

During the summer of 1999, Jernigan testified that he observed West spending an inordinate amount of time reading novels and chatting with co-workers such as Dalstrom and Tanya Byrd. (Jernigan Dep. at 104–111.) Zavar also observed West frequently conversing with Dalhstrom and Byrd. (Zavar Decl. ¶¶ 5–7.) During that same time period, Jernigan asked Quale about the performance of the workers on Quale's team, including West. (Jernigan Dep. at 158–160; Quale Dep. at 112, 115). Jernigan and Quale discussed that West's work rate was declining, the quality of her work product was deteriorating, she had missed a few deadlines, and that she was spending a large amount of time socializing with her co-workers. (Jernigan Dep. at 160–65; Quale Dep. at 113, 117–18).

On Monday, August 30, 1999, West did not go to work. (West Dep. at 200.) West attempted to contact Quale but apparently was unable to reach him. (*Id.*) West then called Chandran around noon to notify him of her intention to take a personal day. (Chandran Dep. at 88–89.) West left a voice mail message with Chandran. (West Dep. at 201.) West had waited until noon because Chandran often did not arrive until eleven. (West Dep. at 202.) Around one that afternoon, Chandran notified Quale that West had called and was not coming in to work. (Quale Dep. at 130.) At some point that day, Jernigan realized that West was not in and asked Quale if he had heard from her. (Jernigan Dep. at 122–25.) Quale responded that he had not. (Quale Dep. at 128–29.) It is unclear from the record whether this exchange occurred before or after Chandran delivered West's message to Quale. Jernigan states that neither West nor Quale related to Jernigan that West had contacted Chandran about her personal day. (Jernigan Dep. at 124–25.) Quale maintains that he had notified Jernigan of West's message to Chandran. (Quale Dep. at 124–25.)

Later that day, Jernigan contacted Meg Cortezi, Maxim's Account Manager for the SCA Gateway Project, to voice his concerns about West. (Jernigan Dep. at 89–90; Cortezi Dep. at 69). Jernigan complained to Cortezi that West, along with Dalstrom, another Maxim contractor, had missed work without providing appropriate notice. (Cortezi Dep. at 49.) Jernigan also expressed his opinion that West was spending too much time at Dalhstrom's cubicle and not enough time on her work. (*Id.* at

70–71; Jernigan Dep. at 91–92). This was the first time Jernigan had complained to Maxim about West's performance. (Cortezi Dep. at 49.)

On the following day, August 31, when West returned to work Quale made several unprofessional comments to her. In front of her co-workers, Quale yelled at West, telling her that she should not take a day off "to go joy riding" and that "she shouldn't be running around with her new boyfriend." (West Dep. at 206.) Chandran testified that Quale spoke to West in "strong tones" on this occasion. (Chandran Dep. at 118–19.) West later went to Quale's office and told him that his inappropriate behavior had to stop. (West Dep. at 207–211.) Quale responded by yelling at West and directing her to leave his office. (*Id.*)

Later that afternoon, West transmitted an email to Jernigan, Quale and other co-workers, stating that she would be out on the upcoming Friday. (West Dep. at 161–162.) West had previously notified Jernigan and Quale that she was taking Labor Day week (September 6–10) off to visit her mother in Hilton Head, South Carolina. The August 31st email stated

> I checked my plane tickets and it appears that I will be taking this Friday, Sept. 3rd off as well as the following week. I appologize [sic] for the inconvenience this may cause, but it is my responsibility to let the appropriate people know in the appropriate manner.

(West Dep. Ex. 12.) This email referenced the earlier disagreement involving West's contested failure to notify Quale or Jernigan of her leave on Monday, August 30th. Jernigan was offended by the tone of West's email. (Jernigan Dep. at 46.) He considered it to be an inappropriate "slap in the face," which he perceived to be a "response to [his] complaining about [West] just not showing up for work on Monday and not giving appropriate notice ...." (*Id.*)

Pursuant to the Master Agreement between MCI and Maxim, "MCI, in its sole discretion, reserves the right to terminate at any time any Contract Personnel ... assigned [by Maxim] to perform Work." (Master Agreement ¶ 6.2.) Jernigan determined that MCI should exercise its right under the Master Agreement and remove West from the SCA Gateway Project because he believed MCI was not "getting its money's worth." (*Id.* at 99–100, 145–46.) Jernigan conferred with his superior Zavar who concurred with the decision. (Zavar Decl. ¶ 8.) Jernigan also discussed the issue with Quale, who confirmed Jernigan's conclusion that West's removal from the Project would not pose a problem. (Jernigan Dep. at 171–72, 236–39.)[1]

On September 1, 1999, Jernigan called Cortezi and informed her that MCI was removing West from the SCA Gateway Project. (Jernigan Dep. at 178–79; Cortezi Dep. at 52–53). Jernigan testified

---

1. Although West contends that Jernigan made the decision to remove her based on Quale's advice, even viewing the record in the light most favorable to West, the admissible facts do not support a finding that Jernigan relied on Quale's judgment. Jernigan states that he made the decision to remove West alone. (Jernigan Dep. at 235). In her deposition, West conceded that she has no evidence to contradict Jernigan's statements that he made the decision based on his personal knowledge of West's performance not on Quale's assess-

ment. (West Dep. at 349). Discount's testimony, which West heavily relies on to make this point, indicates that Discount had no personal knowledge of Jernigan's independent assessment of West's job performance or conversations between Jernigan and Quale about West's work, and that his assumptions about Jernigan relying on Quale were not based on anything Jernigan had said but upon his experience with Jernigan and other contractors. (Discount Dep. at 114–123).

that West was removed because of his negative firsthand impression of her lack of initiative, the inordinate amount of time she spent socializing with co-workers and reading novels at work, and the incident concerning her failure to give appropriate notice for missing work on August 30, 2002, followed by the sarcastic August 31, 2002, email. (Jernigan Dep. at 145–46.) [2]

Later that evening, Cortezi notified West of her removal from the SCA Gateway Project. West told Cortezi that she had been involved in a failed personal relationship with Quale. (Cortezi Dep. at 54–55; West 250–52). West indicated to Cortezi that she believed that Quale was responsible for her removal. (*Id.*) On September 2, 1999, Cortezi informed Jernigan of the alleged West–Quale relationship. Cortezi testified that Jernigan responded that he "figured it was happening." (Cortezi Dep. at 94–95.) Jernigan, on the other hand, denies that he had any knowledge of the relationship between West and Quale. (Jernigan Dep. at 68–69.)

Maxim and MCI took steps in response to West's claim that her removal was prompted by her failed relationship with Quale. Cortezi contacted Jennifer Emrich, a Maxim Customer Support Representative, who referred Cortezi to Tracy Johnson, Maxim's Director of Human Resources. Johnson instructed Cortezi not to place other Maxim employees on the SCA Gateway Project until after Johnson had reviewed West's concerns. (Johnson Aff. ¶ 3.) After interviewing West, Johnson contacted Karen Broadmeadow, MCI's Human Resources Generalist located in the building where West had worked. (*Id.* ¶ 6.) Broadmeadow met with Zavar and Jernigan on several occasions and concluded that West had been removed for performance-based reasons. (Broadmeadow Dep. at 30–31, 36–38.) On September 17, 1999, West's attorneys sent a demand letter to MCI. In light of the demand letter, Broadmeadow informed Johnson that MCI's Legal Department had taken over the investigation. (*Id.* at 97, 99–100.) MCI informed West's attorneys on October 14, 1999, that it had finished its investigation of West's complaint and was adhering to the position that West was removed by Jernigan based on unsatisfactory performance. (Defs.' J.A. Ex. 33.) Maxim procured an assignment for West in San Diego, California starting in December 1999. (West Dep. at 328–29.)

On August 14, 2001, West filed a Complaint with this Court alleging quid pro quo sexual harassment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, against MCI, Maxim, and Quale. The Complaint also raises a claim of tortious interference against Quale with respect to her contractual relationships with MCI and Maxim. All three Defendants filed separate motions for summary judgment. On April 19, 2002, the Court granted the motions for summary judgment in favor of the Defendants, dismissed the case, and tolled appeal of the decision until the Court issued the instant memorandum opinion explaining the merits of the April 19th Order.

## II. DISCUSSION

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for sum-

---

**2.** Byrd, another contract worker charged with administration of the SCA Gateway Project, states in her deposition testimony that Jernigan instructed Byrd to note on West's paperwork that she had been terminated because the project West was working on had ended. (Byrd Dep. at 183.) Byrd states that Jernigan gave her these instructions because he did not want to damage West's record. (*Id.*) However, Byrd also states that Jernigan gave her the same instructions with respect to other contractors who had been removed when in fact their project had continued. (Byrd Dep. at 185, 292–93, 298.)

mary judgment will be granted if it is shown that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *See id.* The moving party is entitled to judgment as a matter of law unless a fair-minded jury could return a verdict for the nonmoving party on the evidence presented. *See id.* at 247–48, 106 S.Ct. 2505. To successfully oppose a motion for summary judgment, the nonmoving party is required to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

"Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. The nonmoving party "cannot create a triable issue of fact in opposition to summary judgment simply by contradicting [her] deposition testimony with a subsequent affidavit." *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir.1999). Depending on the degree of inconsistency, a court has the discretion to disregard the conflicting affidavit in its entirety in favor of the previous sworn deposition testimony. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 973 (4th Cir.1990).

### B. West's Status as an "Employee" of MCI under Title VII.

MCI contends that the Court lacks subject matter jurisdiction over West's claim against MCI because MCI is not an "employer" under Title VII. Because MCI's threshold argument implicates the Court's "very power to hear the case," the Court reviews MCI's contention before reaching the merits of West's discrimination claim. *See Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees based on gender regarding terms, conditions, or privileges of employment. 42 U.S.C. § 2000e–2(a)(1)(2001). Title VII only subjects a defendant to liability if it falls within the statutory definition of an "employer." *See Magnuson v. Peak Technical Serv., Inc.*, 808 F.Supp. 500, 507 (E.D.Va.1992). An employer is defined as a "person engaged in an industry affecting commerce ... who has fifteen or more employees" during a specific period of time. 42 U.S.C.2000e(b). The Act defines an "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). "As a general rule, Title VII only protects employees, and not independent contractors." *Lane v. David P. Jacobson & Co.*, 880 F.Supp. 1091, 1097–98 (E.D.Va.1995)(citing *Spirides v. Reinhardt*, 613 F.2d 826, 828 (D.C.Cir. 1979)). The plaintiff bears the burden of

demonstrating that she is an employee of an employer under Title VII because she always bears the burden of proving that subject matter jurisdiction is proper. *See Bryant v. Clevelands, Inc.*, 193 F.R.D. 486, 487–488 (E.D.Va.2000) (explaining that plaintiff bears burden of demonstrating that court has subject matter jurisdiction over Title VII claim).

■ Whether the relationship between the parties is one of an employer-employee or an independent contractor is a "question of law." *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir.1997). In reaching this conclusion, courts draw from the common law of agency definition of employee. *See id.* at 259. The key factor "[i]n determining whether a hired party is an employee under the common law of agency ... [is] the hiring party's right to control the manner and means by which the product is accomplished." *Farlow v. Wachovia Bank of North Carolina, N.A.*, 259 F.3d 309, 313 (4th Cir.2001). The Fourth Circuit has set forth several other considerations relevant to this inquiry, namely:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 313 (quoting *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). In addition, the Fourth Circuit considers the parties' beliefs regarding the nature of the employment relationship significant. *Farlow*, 259 F.3d at 313. No one of these factors is determinative.

■ Applying these factors, the Court finds that West was an independent contractor and not an employee of MCI for purposes of Title VII. First, the record indicates that MCI did not have direct control over the manner and means of West's work. "The degree of control considers the degree of control of the professional services rendered" rather than "peripheral, administrative details which were incidental to the rendering of ... services." *Farlow*, 259 F.3d at 313. Here, both Discount and Quale assigned West work involving the SCA Gateway Project. However, these superiors did not exercise direct supervisory control regarding how these tasks were carried out. Discount did not provide West with any directions as to how West should complete the tasks assigned to her concerning her COBOL related work. Quale did not directly supervise West's work because he did not have mainframe-COBOL expertise. West largely relied on her own expertise to independently perform and complete her assignments. The fact that Discount and Quale assigned her the work in the first place is more akin to the administrative, oversight that courts find does not qualify as control. *See Farlow*, 259 F.3d at 314 ("[T]he lack of oversight in the actual rendering of her skilled professional services weighs in favor of finding that [plaintiff] was an independent contractor despite the administrative oversight.").

Further, other indicia of control endemic to a typical MCI-employee relationship are absent from the instant case. Unlike with its employees, MCI did not (1) informally or formally evaluate West's performance; (2) counsel or coach her performance; (3) train her or offer to pay for job-related

training; (4) provide West with administrative support; and (5) pay West directly for her services.

Second, the intentions and actions of the parties demonstrate that West, MCI and Maxim, all considered West to be an independent contractor. The Consultant Agreement explicitly states that

> *You [West] recognize and agree* that *you are an employee of Maxim and not an employee of the client [MCI]* and you will look solely to Maxim for all employee benefits in connection with your employment under this agreement.

(Consultant Agreement ¶ 1 (emphasis added)). West's second Employment Agreement also unequivocally states that she is an employee of Maxim and not MCI. (Employment Agreement ¶ 10.) Tellingly, West did not pursue discussions with Jernigan to become an employee of MCI. (West Dep. at 180–81.) When questioned whether she had any interest in becoming an MCI employee, West succinctly responded that she did not. (*Id.*) In both her 1999 and 2000 tax returns, West describes her occupation as "Consultant." (MCI App. Exs. 14 & 15.) *See Lane,* 880 F.Supp. at 1099 (noting plaintiff's description of occupation on tax returns as "Self Sales" as indicative of independent contractor status). Finally, the Master Agreement between Maxim and MCI indicates that MCI intended to treat Maxim employees, including West, as independent contractors. (Master Agreement ¶ 5.1.B.)

Third, the tax and employee benefit treatment of West by Maxim strongly indicates that West was not an employee of MCI. "The failure of an employer to extend employment benefits or to pay any payroll taxes is highly indicative that the employee is an independent contractor." *Farlow,* 259 F.3d at 315 (citations and internal quotes omitted). Under the Master Agreement between Maxim and MCI,

Maxim is responsible for all "employee-related benefits and for all federal and state tax withholding obligations, including federal social security taxes, federal unemployment insurance taxes, and federal and state income taxes." (Master Agreement ¶ 5.1.C.)

Pursuant to the Master Agreement and the Consultant Agreement, Maxim provided employee benefits to West and assumed responsibility for her tax withholding obligations. The fact that MCI did not extend any benefits to West or withhold any taxes is a "virtual admission[ ]" that West was an independent contractor rather than an MCI employee. *See Aymes v. Bonelli,* 980 F.2d 857, 863 (2d Cir.1992)(noting that "every case since *Reid* that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes.")(quoted in *Farlow,* 259 F.3d at 315). Moreover, as discussed above, Maxim paid West's salary. In fact, a Maxim representative made a weekly trip to MCI to distribute paychecks and elicit any complaints or concerns from employees like West. (Cortezi Dep. at 117–119.)

West's central argument in support of finding that she is an MCI employee is the unremarkable claim that MCI retained the right to terminate Maxim contractors at any time and MCI exercised that right when it removed West from the SCA Gateway Project. But West's argument proves too much. Normally, a company that hires an independent contractor retains the right to terminate the contractor when it becomes dissatisfied with the contractor's performance. Under West's theory, a party would always be considered an "employer" under Title VII vis-a-vis an independent contractor simply because it retained the traditional right to terminate the services of the independent contractor. This

conclusion is inconsistent with the general rule that independent contractors are not considered employees under Title VII, and in this case, irreconcilable with the unambiguous intent of the parties that West is not an employee of MCI.

The only factors that lie squarely in favor of finding West an employee of MCI are MCI's role in setting her hours and the leave policy. Reading the facts in the light most favorable to West, MCI required the Maxim independent contractors to work on the SCA Gateway Project during certain core hours. (Cortezi Dep. at 35.) Further, West was required to have her leave approved by MCI. (*Id.* at 36–37.) These factors are indicia of control. Further, although Maxim provided West with the laptop to perform her work, West was allowed to use MCI's software and local access network and she performed all of her work at MCI's facility.

Nonetheless, "balanced against the clear intent of the parties and the striking economic realities in this case," *e.g.*, the tax withholding obligations, benefits, and payment, the Court finds that West was an independent contractor of MCI and not its employee. *See Farlow*, 259 F.3d at 316 (holding that financial relationship and intent of parties outweighed plaintiff's on-site work and hiring company's control of hours at the office in determining that hiring company was not an employer under Title VII). Accordingly, summary judgment in favor of MCI is granted on West's Title VII claim.

## C. West's Quid Pro Quo Claim.

Turning to the merits of West's Title VII claim, the Court finds that West can-

not satisfy several basic elements of her quid pro quo sexual discrimination claim. Even assuming West were considered an employee of MCI under Title VII, her claim against MCI, as well as against Maxim and Quale, fails because West does not provide any evidence demonstrating that a genuine issue of fact exists concerning Quale's alleged unwanted sexual advances and whether Quale's alleged actions to have her removed from the SCA Gateway Project were "because of sex."

As discussed above, Title VII prohibits discrimination against employees based on gender regarding terms, conditions, or privileges of employment. Courts, including the Fourth Circuit, traditionally categorized sexual discrimination claims into two varieties: 1) sexual harassment so pervasive that it would create a hostile work environment, and 2) sexual harassment where submission to sexual demands are made a condition of a tangible employment benefit, *i.e.*, quid pro quo. *See, e.g., Spencer v. General Electric Co.*, 894 F.2d 651, 658 (4th Cir.1990), *overruled on other grounds by Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Courts originally relied on this distinction in determining the issue of vicarious liability to the employer. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Supreme Court found that the distinction was irrelevant with respect to vicarious liability; whether the claim was one of hostile work environment or quid pro quo, the Court held that an employer is liable under the same factors. *See id.*[3]

---

**3.** The Court explained that "[w]henever sexual harassment by a supervisor takes the form of a 'tangible employment action' against a subordinate, vicarious liability will be imposed on the employer." *Brown v. Perry*, 184 F.3d 388, 394 (4th Cir.1999)(quoting *Ellerth*,

524 U.S. at 752, 118 S.Ct. 2257). To escape liability, the employer must demonstrate that it exercised reasonable care to prevent and correct the sexual harassment and that the plaintiff employee unreasonably neglected to take advantage of the preventive or corrective

However, the Court explained that the terms quid pro quo and hostile work environment remained useful: "To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII." *Id.* at 753, 118 S.Ct. 2257. Since West explicitly frames her Title VII claim as one of quid pro quo sexual harassment, the Court determines whether she has made a threshold showing under the traditional standards courts have applied in the past and continue to do so after *Ellerth* to quid pro quo claims. *See, e.g., Holtz v. Marcus Theatres Corp.,* 31 F.Supp.2d 1139, 1145 (E.D.Wis.1999); *Robles v. Cox & Co.,* 154 F.Supp.2d 795, 803 (S.D.N.Y.2001).

To establish a prima facie claim of quid pro quo sexual harassment, a plaintiff must present evidence that (1) she belongs to a protected group; (2) she was subject to unwelcome sexual advances; (3) the unwelcome conduct was because of sex; (4) her reaction to the harassment affected tangible aspects of her employment; and (5) there are grounds for holding the employer liable for the employee harasser's conduct. *See Spencer,* 894 F.2d at 658; *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982); *Holtz,* 31 F.Supp.2d at 1147; *Robles,* 154 F.Supp.2d at 803.

■ West argues that after she ended her consensual relationship with Quale over July 4th weekend, Quale continued to make unwanted sexual advances in the form of phone calls to her home which West did not return. In response to her rebuffing Quale's advances, Quale then persuaded Jernigan to remove West from the SCA Gateway project. Quale's conduct, West contends, amounts to unlawful quid pro quo sexual harassment under Title VII.

The fundamental problem with West's argument is that there is no quid in her quid pro quo claim. *See Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 473 (8th Cir.1995)(affirming district court's granting of summary judgment on plaintiff's quid pro quo claim where plaintiff did not provide evidence of unwanted sexual advances). In other words, West cannot meet the essential element that she was subject to any unwelcome sexual advances or conduct of any kind. West asserts that the phone calls "are the sexual advances lying at the heart of her quid pro quo claim." (Pl.'s Opp. at 24–25.) But West never received the phone calls and never actually spoke to Quale. On the three or four occasions that Quale called her home during July and August, he left messages with West's roommate Carl Pittman. Pittman testifies that Quale simply requested that Pittman ask West to return his call. It is undisputed that neither West, nor Pittmann, have any personal knowledge as to why Quale called her at home. The only person with personal knowledge behind the rationale for the calls is Quale and he testified that he called West to discuss work-related matters. (Quale Dep. at 264–65.)

West essentially contends that the Court should *assume* that Quale was calling her to resume their sexual relationship. However, on summary judgment West must come forward with *facts* supporting the essential elements of her claim, not assumptions based entirely on speculation. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d

---

measures instituted by the employer. *Perry,* 184 F.3d at 395. Because the Court finds that West has failed to state a prima facie

claim of sexual harassment, it does not reach the issue of employer liability.

962, 967 (4th Cir.1995). West's unsubstantiated belief that Quale was calling her at home for the purpose of resuming their sexual relationship does not create a genuine issue of fact as to whether Quale made an unwanted sexual advance. West's conclusory and speculative belief standing alone is therefore insufficient to withstand summary judgment. *See Carter v. Ball*, 33 F.3d 450, 461–62 (4th Cir.1994) ("conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment.").

West's reliance on *Robles*, 154 F.Supp.2d 795, and *Otto v. Heckler*, 781 F.2d 754 (9th Cir.1986), is misplaced. West cites *Robles* and *Otto* for the proposition that telephone calls constitute sexual advances. But neither case stands for that point. *Robles* is factually inapposite. *Robles* dealt with a quintessential quid pro quo claim where the supervisor forcibly subjected the plaintiff to have sexual relations with him and then retaliated against her when she ended the non-consensual relationship. The numerous harassing phone calls in that case were just one aspect of the unlawful conduct the plaintiff endured after termination of the relationship which formed the basis of the court's finding that the plaintiff had established a continuing violation for the purposes of the statute of limitations period under Title VII. *See Robles*, 154 F.Supp.2d at 806. *Otto* is equally unavailing. In that case, the Ninth Circuit addressed the harassing phone calls at issue under the plaintiff's claim against a government official for common law tort liability, not Title VII. *See Otto*, 781 F.2d at 758.

In addition to Quale's phone calls, West states that Quale continued to approach her in an inappropriate manner after the termination of their consensual relationship. In her Declaration in opposition to summary judgment, West states that after the July 4th Breakup Quale entered her office and intimately touched her in an inappropriate manner. However, West's Declaration is flatly contradicted by her deposition testimony. West testified that Quale touched her intimately in her office *only* in the period *preceding* the July 4th Breakup. (West Dep. at 520.) Further, West testified that Quale did not *say or do anything* inappropriate on his visits to her office after the July 4th Breakup. (West Dep. at 557.) The Court therefore disregards West's Declaration that Quale touched her inappropriately after their consensual relationship terminated. *See Rohrbough*, 916 F.2d at 975–976. In sum, West's proffer of Quale's three or four phone unanswered phone calls to her home does not create a triable issue of fact regarding the essential element of unwanted sexual advances. Summary judgment in favor of the Defendants is therefore warranted because West provides no evidence of any unwanted sexual advances. *See Cram*, 49 F.3d at 473–74.

West also fails to provide any evidence to satisfy the third, and arguably most important element of her sexual harassment claim—that Quale's actions against her were because of sex. West's legal theory under Title VII is that the unwanted sexual advances by Quale led to West's termination and thereby provide the essential causal "because of sex" link. (Pl.'s Opp. at 28.) To be sure, evidence of an earnest sexual solicitation is a valid evidentiary route to establishing the "because of sex" causation element. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). But as described above, West does not provide any evidence of unwanted sexual advances. Therefore, the earnest solicitation avenue to demonstrating that Quale's actions were because of sex is effectively foreclosed to West.

■ In other words, under an earnest solicitation or quid pro quo sexual harassment theory in the context of a failed consensual relationship, West must come forward with some evidence of unwanted sexual advances after termination of her relationship with Quale to demonstrate that his campaign to remove her from the SCA Gateway Project was "because of sex." *See Campbell v. Masten*, 955 F.Supp. 526, 530 (D.Md.1997) ("Negative employment actions which follow on the heels of a consensual relationship gone sour do not constitute *quid pro quo* sexual harassment unless they are linked in some way to other or further 'unwanted' sexual advances."); *See also Holtz*, 31 F.Supp.2d at 1148 (granting summary judgment on plaintiff's quid pro quo claim where she failed to present evidence of any demands for sexual favors after termination of sexual relationship). Having failed to do so, West cannot establish a prima facie sexual harassment claim.

In light of the absence of any evidence of unwanted sexual advances, the record arguably supports Plaintiff's theory that Quale's alleged actions were because of his animosity toward West for ending the consensual relationship rather than her gender. Courts have consistently drawn the distinction between "actions based on discriminatory animus and those based on personal animosity resulting from failed consensual relationships." *Pipkins v. City of Temple Terrace, Florida*, 267 F.3d 1197, 1199 (11th Cir.2001) (finding that alleged harassment after failed relationship was taken because of disappointment over the breakup rather than plaintiff's gender). The former is actionable under Title VII

and the latter is not because "such a motivation is not 'because of sex' ...." *Id.* (quoting *Oncale* 523 U.S. at 80–81, 118 S.Ct. 998).

Here, West admits that Quale's actions toward her were driven by his animosity over her termination of the relationship and her starting a relationship with another co-worker a month later. (West Dep. 253, 292–93.) West does not provide any other grounds explaining Quale's actions to have her removed from the SCA Gateway Project. Therefore, even assuming the veracity of her allegations, West cannot demonstrate that Quale's harassment was because of sex and summary judgment in favor of the Defendants is granted.[4]

**D. West's Tortious Interference Claim**

■ The Court also grants summary judgment on West's tortious interference claim with her at-will contract against Quale. To establish a prima facie case of tortious interference with an at-will contract, the plaintiff must show "not only *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed *improper* methods." *Duggin v. Adams*, 234 Va. 221, 227, 360 S.E.2d 832 (1987) (emphasis in original). Improper means are methods of interference that are "illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.* West's tortious interference claim relies on her contention that Quale violated Title VII. As discussed above, West's Title VII claim cannot survive summary judgment. Since West's

4. The Court does not reach the remaining prongs in West's prima facie claim because West has failed to provide admissible evidence creating a genuine issue of fact regarding two of the essential elements for a quid pro quo sexual harassment claim. Along those lines, since West cannot establish a prima facie claim, the Court does not reach Defendants' non-discriminatory rationale for her removal from the Project or whether its rationale was in actuality a pretext for discrimination.

tortious interference claim turns on her Title VII claim, then her tortious interference claim falls as well.

## III. CONCLUSION

This case is not a case of sex discrimination, rather it is arguably a case about the end of an office romance, unrequited affection and jealousy. Grievances stemming from unfulfilled office romances are not within the purview of Title VII. As office romances are not an uncommon experience in the workplace, the Court must carefully consider each case and deliberately parse Title VII to ensure that workers are not preyed upon by superiors because of sex and to ensure that sex discrimination does not turn the work place into a hostile work environment. Sex discrimination violates a worker's personal dignity, privacy and right to earn a living and to be productive in the workplace. In this case, the Court concludes that because West has failed to provide any evidence of unwanted sexual advances after termination of her consensual relationship, she cannot demonstrate that she suffered an adverse employment action "because of sex." Therefore for the reasons stated above, it is hereby

ORDERED that Defendants' Motions for Summary Judgment are GRANTED.

The Clerk is directed to forward a copy of this Order to the counsel of record.